IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

ROSS BONIFACIO ABIDO,

      Petitioner,

v.                          Case No. 2:08-cv-00341

DAVID BALLARD, Warden,
Mount Olive Correctional Complex,

      Respondent.

**PROPOSED FINDINGS AND RECOMMENDATION**

Pending is Respondent's Motion for Summary Judgment (# 6). This matter is assigned to the Honorable Joseph R. Goodwin, Chief United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).

**PROCEDURAL HISTORY AND PETITIONER'S CLAIMS FOR RELIEF**

<u>Petitioner's criminal proceedings and direct appeal</u>

On January 13, 2004, Petitioner was indicted by a Nicholas County grand jury on four counts of sexual assault in the first degree, in violation of W. Va. Code § 61-8B-3(a)(2) and one count of attempted sexual assault in the first degree, in violation of W. Va. Code §§ 61-11-8 and 61-8B-3(a)(2). (# 6, Ex. 1).

Following a jury trial, on August 26, 2004, Petitioner was convicted of two counts of sexual assault in the first degree, and one count of sexual abuse in the first degree, in violation of W.

Va. Code § 61-8B-7, which is a lesser-included offense of sexual assault in the first degree.  The trial court entered a directed verdict in Petitioner's favor on Counts Three and Five of the indictment prior to the jury's deliberation.  (Id., Ex. 2).

On October 29, 2004, Petitioner was sentenced to two concurrent terms of fifteen to thirty-five years in the penitentiary on his two convictions for sexual assault in the first degree, and a consecutive term of one to five years for his conviction for sexual abuse in the first degree.  (Id., Ex. 3).

On April 15, 2005, Petitioner, by counsel, filed a Petition for Appeal in the Supreme Court of Appeals of West Virginia (the "SCAWV"), asserting only one ground for relief, which stated: "The Circuit Court of Nicholas County erred by refusing to permit the Defendant's pre-trial discovery of the victim's DHHR file."  (Id. Ex. 4).  The SCAWV refused the Petition for Appeal on June 9, 2005. (Id.)

<u>Petitioner's state court habeas corpus proceedings</u>

On December 22, 2005, Petitioner filed a Petition for a Writ of Habeas Corpus in the Circuit Court of Nicholas County (<u>Abido v. McBride</u>, Case No. 05-C-239).  (Id., Ex. 5).  Attorney Harley E. Stollings was appointed to represent Petitioner in his Nicholas County habeas corpus proceedings.  Following an evidentiary hearing conducted on December [15-] 18, 2006, the Circuit Court addressed the merits of Petitioner's claims and denied the habeas corpus

2

petition by order entered June 28, 2007. (Id., Ex. 6).

On December 12, 2007, Petitioner, by counsel, Harley E. Stollings, filed a Petition for Appeal from the denial of his Nicholas County habeas corpus petition.   In the Petition for Appeal, Petitioner raised the following grounds for relief:

1.   The court erred in finding trial counsel made a reasonable effort to obtain the identity of the initial interviewer by seeking to subpoena the DHHR file.

2.   The court erred in finding that trial counsel's decision to not interview the alleged victim before trial was not ineffective assistance of counsel.

3.   The court erred in finding that trial counsel's decision to not interview Barbara Harris or call her as witness at trial was not ineffective assistance of counsel.

4.   The court erred in failing to it was [sic; finding it was not] ineffective assistance of counsel for trial counsel to fail to introduce evidence that the alleged victim had intentionally mutilated herself by carving the Defendant's initials into her ankle.

5.   The court failed in finding it was not ineffective assistance of counsel to not interview Melanie (Cindy) Deal or Edward (E.T.) Barr prior to trial or call them as witnesses at trial.

6.   The court failed in finding it was not ineffective assistance of counsel for trial counsel to not interview the alleged victim's mother or to call her as a witness during the trial of this matter.

7.   The court erred in finding the assistance given Mr. Abido before and during the trial of this matter was not ineffective.

(Id., Ex. 7).   The SCAWV refused the Petition for Appeal on February 28, 2008.   (Id.)

<u>Petitioner's federal petition</u>

Petitioner filed the instant petition on May 23, 2008, raising the following grounds for relief:

1.  Petitioner was denied his constitutional right to an effective assistance of counsel as guaranteed by the First, Sixth and Fourteenth Amendment to the Constitution of the U.S.A.

    a.  Defense Counsel, Stephen Callaghan, failed to adequately investigate the case against his client.

    b.  Defense Counsel failed to contact, interview or subpoena defense witnesses I told could contribute to my defense.

2.  The Circuit Court of Nicholas County erred by refusing to permit the Defendant's pretrial discovery of the victim's DHHR file.

(# 2).

On August 6, 2008, Respondent filed a Motion for Summary Judgment and accompanying exhibits, and a Memorandum of Law in support thereof (docket ## 6, 7).  Although Petitioner had already filed a "Reply" (# 11), pursuant to the holding of <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), Petitioner was notified that he had the right to file an additional response to Respondent's motion, submitting affidavits or statements subject to the penalties of perjury, exhibits, or other legal or factual material supporting his position in the case.  Petitioner did not file an additional response.  This matter is ripe for determination.

4

## STANDARD OF REVIEW

Title 28 U.S.C. § 2254(d), which was adopted as part of the Anti-terrorism and Effective Death Penalty Act of 1996 (the "AEDPA") provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 412-13 (2000), the Supreme Court of the United States held that under the "contrary to" clause, a federal court may grant a writ of habeas corpus with respect to claims adjudicated on the merits in state court only if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) if the state court decides a case differently from the Supreme Court on a set of materially indistinguishable facts. The Court further held that under the "unreasonable application" test, a federal court may grant a writ of habeas corpus with respect to a claim adjudicated on the merits in state court only if the state court identifies the correct governing principle from the Supreme Court's decision, but

5

unreasonably applies that principle to the facts of the prisoner's case.  Id. at 413.

Moreover, the AEDPA contains a presumption that a state court's factual findings are correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Rule 56 of the Federal Rules of Civil Procedure applies to habeas corpus proceedings.  See, e.g., Blackledge v. Allison, 431 U.S. 63, 81 (1977); Maynard v. Dixon, 943 F.2d 407, 412 (4th Cir. 1991).  Entry of summary judgment is appropriate when there is "'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Rule 56(c), Fed. R. Civ. P.).

## FACTUAL BACKGROUND AND TRIAL TESTIMONY

At Petitioner's trial, the jury first heard testimony from a social worker, Kay Smalley.  Ms. Smalley was employed by the Children's Home Society of West Virginia, which had been providing family preservation services to Barbara and Wayne Harris in Richwood, West Virginia.  Ms. Smalley stated that, around 10:00 a.m. on September 25, 2003, she arrived at the Harris residence to

6

close out the case.  Ms. Smalley stated that she had been to the home on several other occasions.  She testified that when she knocked on the door, a man, who was not a member of the Harris family, and whom she had never seen before, answered the door.  Ms. Smalley stated that she could see through the door that the man had come out of a bedroom of the home.  The man in question was later identified as Petitioner.

Ms. Smalley asked Petitioner if either Wayne or Barbara Harris were at home.  Petitioner stated that Wayne was asleep on a couch in another room.  Ms. Smalley then went into the other room and awakened Wayne Harris.  At that time, Petitioner advised them that he was leaving.

Wayne Harris told Ms. Smalley that his wife, Barbara, had gone to the food pantry.  As Ms. Smalley was talking to Mr. Harris, she heard someone coughing in the bedroom that Petitioner had earlier exited.  At that time, the alleged victim, M.H., who is Barbara and Wayne Harris's niece, came out of the bedroom.  Ms. Smalley testified that, when she made her notes from the home visit, she stated that Petitioner had been in the home, and that she was later asked by a Child Protective Services ("CPS") worker to write a letter stating what she had seen while she was at the Harris residence.  (# 10, Ex. 8 at 66-70).

The jury also heard testimony from Senior West Virginia State Trooper Brad Reed, who was the investigating officer in

Petitioner's criminal case.   Trooper Reed testified that he received a referral concerning alleged sexual abuse from West Virginia Department of Health and Human Resources ("DHHR") case worker Cheryl Pittsenbarger, who also told him that she needed assistance in removing some children from the Harris's home that evening.   The referral concerned an allegation that Petitioner, a family friend of the Harris's, had sexually abused the Harris's niece, M.H.   Trooper Reed subsequently determined that Petitioner was 37 years of age at the time, and that the alleged victim, M.H., was eleven.   (Id. at 71-73).

After the children were removed from the Harris residence, Trooper Reed attempted to locate and interview Petitioner. Petitioner agreed to meet with Trooper Reed at the Richwood State Police detachment.   Before beginning the interview, Trooper Reed advised Petitioner of his Miranda rights, which were printed on the interview form, and told Petitioner that he was not under arrest at that time.   Petitioner agreed to give a statement and signed the waiver form.   Trooper Reed further testified that he asked Petitioner questions and wrote down the questions and Petitioner's responses.   Thereafter, Petitioner was asked to verify the statement.   (Id. at 73-80).

Petitioner admitted that he kissed M.H. and further stated that he "put his hand down her pants and started licking her." (Id. at 82).   Trooper Reed testified that Petitioner additionally

stated as follows:

    Question: "How long did you lick her?"

    Answer: "About a minute.  I quit, We just -- Then we just
    laid there on the bed.  The welfare lady arrived."

    Question: "Did you get naked with her?"

    Answer: "I didn't get naked."

    Question: "Did you have your pants down?"

    Answer: "No, sir."

    "Did you ever dry hump her with your pants on?"

    "Yes, my pants -- Yes, my pants was on."

    "Did you ever try to put your penis in her?"

    Answer, "No, sir."

    Did you ever try to have her suck your penis?"

    Answer, "No, sir, at that time, but we just -- but we had
    joked about her sucking my penis.  She would tell me
    about how she knows how to suck a penis."

(<u>Id.</u>)  Petitioner denied that he touched or tried to have sexual

intercourse with M.H. on any other occasions.  (<u>Id.</u> at 83).

    Trooper Reed further testified that, after conducting the

interview with Petitioner, he subsequently learned that there was

another alleged incident between Petitioner and M.H., which

allegedly occurred at the Harris's residence at nighttime.  (<u>Id.</u> at

85).

    On cross-examination, Petitioner's counsel, Stephen Callaghan,

questioned Trooper Reed about his criminal investigation report and

his testimony before the grand jury.  The criminal investigation

report contained a statement by the alleged victim, M.H., concerning the second alleged incident, which stated:

> Ross Abido touched my privates with his finger and his penis the night at Barbara's house in Wayne's room when Barbara was asleep on the floor in the front room. Wayne was asleep on the couch when he did it to me. He came to Barbara's house to see me every week, and he kissed me on the lips, and he tried to make me suck his penis, but I would not do it to him, and it was two weeks ago when he did it to me.

(Id. at 92). Trooper Reed's investigation report further stated, "Mr. Abido pulled her and his pants down and was putting his finger and penis inside of her." (Id.) Mr. Callaghan questioned Trooper Reed about why he put that sentence in the report, when neither the victim's, nor Petitioner's, statements said anything about their pants. (Id. at 92-93).

Trooper Reed told the grand jury that Petitioner "started kissing her and making love to her. He started rubbing her breasts. He fingered her vagina, and then he pulled her pants down and started licking her vagina." (Id. at 94). Mr. Callaghan attempted to challenge Trooper Reed's credibility concerning the accuracy of that testimony.

The alleged victim, M.H., also testified for the State. She stated that she was asleep in her uncle's bedroom, when Petitioner came in and started kissing her and then stuck his finger in her vagina. She stated that Petitioner also put his mouth or his tongue in her vagina that morning. (Id. at 108-110). M.H. also testified about a separate time at her aunt and uncle's house, when

Petitioner was at the house at night, and woke her up and "tried to screw" her by putting his penis in her vagina.  (Id. at 111).  She further testified that this occurred about two weeks before the police and the DHHR people started talking to her about it.  (Id. at 112).

At the close of the State's case in chief, Mr. Callaghan moved for a judgment of acquittal, which was granted as to Counts Three and Five of the indictment.  The motion for judgment of acquittal was denied as to the remaining counts.  (Id. at 116-120).

<u>Petitioner's case in chief</u>

Petitioner called Cheryl Pittsenbarger, the CPS worker who did the initial assessment of the case for DHHR, as a defense witness.  Ms. Pittsenbarger testified that she interviewed the victim on October 17, 2003.  (Id. at 124-125).  Ms. Pittsenbarger further testified about the initial assessment and the statements made on the intake form.  Ms. Pittsenbarger read from the intake form as follows:

> Interview with [M.H.] this day.  The CSU reveals her disclosing sexual abuse by Ross Abido.  She states that accused -- She states the abuse occurred while she was visiting her -- visiting aunt, Barbara Harris, on weekends.  She stated Ross came into the bedroom and stuck his finger in her and licked her out.  She states he has not -- she has not told her mother.

(Id. at 125-126).  Ms. Pittsenbarger also indicated that M.H. wrote her own statement, and then gave a videotaped statement, during which she read her written statement.  Ms. Pittsenbarger was not

11

present while M.H. wrote her statement.   The videotaped statement was played for the jury.  (<u>Id.</u> at 127-129).

Petitioner also testified at his trial.   Petitioner immediately denied molesting M.H.  (<u>Id.</u> at 136).  He stated that M.H. repeatedly came on to him and made statements like, "I love you, Ross."  Petitioner stated that he rejected her advances and told her she was too young for him.  (<u>Id.</u>)  Petitioner testified that he admitted to engaging in the conduct when he met with Trooper Reed because M.H. asked him to, so she wouldn't be removed from her mother's custody.  (<u>Id.</u> at 137).

However, Petitioner further testified as follows:

Q.   Well, what physical contact, sexual contact, did you have with [M.H.]?

A.   Oh, just kissing.  She kissed me.  I was over -- This one time I was over with Barbara Harris's -- That's in front of Barbara and Wayne Harris.  I was sitting on the couch.  She sat on my lap, kissed me (demonstrating), and she said, "There -- There you go.  See.  They don't get mad."  That's exactly her word.

(<u>Id.</u> at 139).  Although he denied touching M.H. in a sexual manner before the jury, Petitioner admitted that he had developed feelings for M.H. and that he loved her.  (<u>Id.</u> at 140, 143, 145-147).  He also admitted to laying down on the bed with M.H. on the morning that the social worker came to the Harris's house, but stated that nothing happened.  (<u>Id.</u> at 144-145).  Petitioner reiterated that he gave a "fake confession" to Trooper Reed.  (<u>Id.</u> at 148-149).

Petitioner further testified that Barbara Harris repeatedly made sexual advances toward Petitioner and suggested that she and M.H. engage in sexual conduct with Petitioner. (<u>Id.</u> at 150).

In closing arguments, Mr. Callaghan attempted to attack the credibility of Trooper Reed and to assert that the social workers who met with M.H. had steered her into making certain statements.

**<u>ANALYSIS</u>**

**A.  Ineffective assistance of counsel claims.**

In Ground One of his federal petition, Petitioner contends that his trial counsel, Stephen O. Callaghan, provided ineffective assistance of counsel by not properly investigating the case and not interviewing certain potential defense witnesses. In particular, Petitioner asserts that Mr. Callaghan did not interview the victim, her aunt and uncle, Barbara and Wayne Harris, Petitioner's ex-wife, Melanie (Cindy) Deal, the victim's cousin, Edward (E.T.) Barr, or the victim's mother, Matilda Barr.

Petitioner challenges Mr. Callaghan's failure to interview Wayne Harris, despite the fact that he was asleep in the next room when the alleged sexual assaults occurred. Petitioner further asserts that an investigation and interview of Barbara Harris would have enabled Mr. Callaghan to develop evidence that Barbara Harris had previously been convicted of a crime involving sexual abuse of another young female, and that Mrs. Harris repeatedly suggested that Petitioner engage in sexual activity both with herself and

13

M.H., and that she was "sexually amoral, voyeuristic and a sexual predator." (# 1 at 3).

Petitioner further asserts that, had Mr. Callaghan interviewed Melanie Deal and Edward Barr, and called them as witnesses at trial, he could have bolstered Petitioner's testimony that M.H. was obsessed with him to the point of carving Petitioner's initials into her ankle. Petitioner contends that both Melanie Deal and Edward Barr had seen the scars on M.H.'s ankle from the self-mutilation. (Id. at 3-4).

Petitioner's federal petition does not state what additional evidence the victim's mother, Matilda Barr, could have offered to support his defense. (Id.)

The Supreme Court addressed the right to effective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984). In Strickland, the Court adopted a two-pronged test for determining whether a defendant was provided inadequate assistance of counsel. The first prong is competence; Petitioner must show that the representation fell below an objective standard of reasonableness. 466 U.S. at 687-91. There is a strong presumption that the conduct of counsel was in the wide range of what is considered reasonable professional assistance, and a reviewing court must be highly deferential in scrutinizing the performance of counsel. Id. at 688-89.

In order to meet the first prong, a defendant must identify the acts or omissions of counsel that are

14

alleged not to have been the result of reasonable
professional judgment. The court must then determine
whether, in light of all the circumstances, the
identified acts or omissions were outside the wide range
of professionally competent assistance . . . . [C]ounsel
is strongly presumed to have rendered adequate assistance
and made all significant decisions in the exercise of
reasonable professional judgment.

Id. at 690.

The second prong is prejudice; "[Petitioner] must show that
there is a reasonable probability that, but for counsel's
unprofessional errors, the result of the proceeding would have been
different. A reasonable probability is a probability sufficient to
undermine confidence in the outcome." Id. at 694. The AEDPA "adds
a layer of respect for a state court's application of the legal
standard." Holman v. Gilmore, 126 F.3d 876, 881 (7th Cir. 1997).
The Circuit Court of Nicholas County identified and used this
standard of review in its analysis of Petitioner's ineffective
assistance of counsel claims. (# 6, Ex. 6 at 2-4).

Respondent's Motion for Summary Judgment begins by citing to
the state habeas court's findings, which state:

All the decisions Mr. Callaghan made could be classified
as reasonable strategic decisions. It is not
unreasonable to not call witnesses who would only speak
to the fact that the victim carved the Petitioner's
initials into her ankle. Such behavior could very well
show an unhealthy attraction between the victim and the
Petitioner and would most likely not have been viewed in
a positive light by the jury. Not looking into Barbara
Harris is also not unreasonable or deficient. The fact
that she may have engaged in crude behavior and/or
encouraged the Petitioner [sic; victim] to engage in
certain activities with the Petitioner does not make
those activities any more legal. It does not arise to

the level of unreasonableness stated in State v. Miller[1]
to not interview the injured party, an eleven-year-old
sexual assault victim, when you have access to her
videotaped statement. And certainly, Mr. Callaghan made
a reasonable effort to obtain the Department of Health
and Human Resources file on the victim. Failing to
obtain the file is not unreasonable.

However, even assuming arguendo that these actions
meet the standard of objective unreasonableness in State
v. Miller, the Petitioner would not have been able to
show that it was likely that a jury would have reached a
different result. (# 6, Ex. 6 at 10-11).

(# 7 at 6-7). Respondent then addresses each of Petitioner's

claims of ineffective assistance of counsel.

Respondent's Memorandum of Law states:

Petitioner argues that trial counsel should have
interviewed potential witness Barbara Harris because
Harris, the victim's aunt, had been previously convicted
of aiding and abetting third degree sexual assault
involving a teenage girl. Petitioner also claims that
Barbara Harris encouraged the victim to make sexual
advances toward him. Petitioner further argues that
trial counsel was ineffective for not interviewing Wayne
Harris who was asleep on the couch in another area of the
scene of the crime during the assault. Petitioner also
claims that trial counsel was ineffective for not
interviewing the victim prior to trial.

(Id. at 8). Respondent then addresses the duty to investigate, as

set forth in Strickland:

Strategic choices made after thorough investigation of
law and facts relevant to plausible options are virtually
unchallengeable; and strategic choices made after less
than complete investigation are reasonable precisely to
the extent that reasonable professional judgments support

---

[1]  In State v. Miller, 495 S.E.2d 114 (W. Va. 1995), the SCAWV
employed the Strickland standard as the standard of review for
ineffective assistance of counsel claims brought in West Virginia
state courts.

> the limitations on investigation. In other words,
> counsel had a duty to make reasonable investigations or
> to make a reasonable decision that makes particular
> investigations unnecessary. In any ineffectiveness case,
> a particular decision not to investigate must be directly
> assessed for reasonableness in all the circumstances,
> applying a heavy measure of deference to counsel's
> judgments.

466 U.S. at 690-91. (_Id._) Using these standards, the undersigned will address Petitioner's claims of ineffective assistance of counsel for failure to interview and call each of the potential witnesses discussed by Petitioner.

### 1.  Barbara Harris.

Respondent asserts that Petitioner fails to articulate how any conviction of Barbara Harris or any of her conduct would have any bearing on Petitioner's own guilt or innocence. Respondent further asserts, "Moreover, any independent actions of witness Barbara Harris to entice Petitioner to commit the crimes or to abet the crimes by encouraging the victim does not diminish or mitigate Petitioner's culpability or guilt." (_Id._ at 9).

Respondent further addresses the potential prejudice of Barbara Harris' testimony as follows:

> As the habeas court observed, the record indicates that
> the testimony of Barbara Harris would have been very
> likely to have prejudiced the jury against the defense.
> (Resp't Ex. 6 at 6). Testimony given at the December
> habeas hearing suggests that the victim, the Petitioner
> and the victim's aunt, Barbara Harris were involved in
> behavior so disturbing that any such evidence regarding
> the child victim's involvement in self-mutilation and her
> aunt's part in encouraging the abuse would have only
> supported the findings of the jury. Therefore, any
> decision by trial counsel in this regard was a clear

17

matter of trial strategy.  Analyzing trial strategy
without a showing of unreasonableness is second guessing
by a reviewing court and prohibited by <u>Strickland</u>.

(<u>Id.</u>)

Petitioner's "Reply" further addresses his claim that Mr.
Callaghan should have further investigated the potential of using
Barbara Harris as a defense witness at trial.  Petitioner states:

> Petitioner will admit that the relative risks and
> benefits of presenting certain witnesses is a matter of
> professional judgment.  This is a case where the defense
> attorney completely failed to investigate or interview
> defense witnesses [footnote omitted].  Counsel "has a
> duty to make reasonable investigations or to make a
> reasonable decision that makes particular investigations
> unnecessary." [footnote omitted].  There is a distinction
> between a tactical or reasonable professional judgment to
> limit an investigation and a failure to do so as a result
> of indolence.  There [sic; The] former is appropriately
> assessed under the deferential standard, while the latter
> constitutes ineffective assistance of counsel provided
> the requisite prejudice resulted [footnote omitted].

> The state habeas court found that Mr. Callaghan's
> decision not to investigate or subpoena Barbara Harris as
> a witness was a strategic decision.  Petitioner has
> maintained that the alleged victim was either lying or
> fantasizing.  Petitioner testified that M.H., in the
> company of and with the encouragement of Barbara Harris,
> crudely and repeatedly make [sic; made] sexual comment[s]
> to petitioner and invited petitioner to engage in sexual
> activity.  Petitioner testified that Barbara Harris, in
> the presence of M.H. repeatedly engaged in similar
> behavior and repeatedly offered to perform oral sex upon
> petitioner in the presence of M.H. either alone or along
> with M.H.  (Hab. Tr., p. 5)

> Mr. Callaghan asserts he made a strategic decision
> not to call Barbara Harris as a witness to avoid any
> discussion of such crude behavior before the jury (Hab.
> Tr., pp. 5, 6).  Either Mr. Callaghan was derelict in
> failing to prepare his client to testify and persuade
> petitioner to avoid this topic or Mr. Callaghan was
> derelict in failing to call Barbara Harris and Melanie

(Cindy) Deal to substantiate petitioner's testimony concerning Ms. Harris and M.H.'s behavior once this topic had been broached. In either case, counsel's performance was deficient given the absence of even an exploratory interview of Ms. Harris.

(# 11 at 6-7).

Petitioner asserts that Mr. Callaghan's "failure to substantiate the behavior attributed to Ms. Harris was detrimental to petitioner's claim of innocence." (Id. at 8). However, Petitioner confessed that he had engaged in sexual conduct that satisfied the statutory elements of first degree sexual assault and first degree sexual abuse. His subsequent claim that his confession was "fake" was an issue of credibility for the jury to decide. The potential questioning of Barbara Harris about her "crude sexual behavior" would not have contradicted Petitioner's admission that he had engaged in sexual conduct with the victim. Accordingly, even if it were objectively unreasonable for Mr. Callaghan to not attempt to interview or further investigate the potential use of Barbara Harris as a defense witness, the undersigned proposes that the presiding District Judge **FIND** that Petitioner cannot show the requisite prejudice from that failure to warrant habeas corpus relief.

The undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly-established federal law, and that

Respondent is entitled to judgment as a matter of law on this claim.

### 2. Wayne Harris.

Petitioner also contends that Mr. Callaghan failed to interview Wayne Harris, the victim's uncle, or to call him as a witness at trial. Wayne Harris was asleep in another room at the time that the alleged sexual assaults took place. (# 1 at 3).

Respondent's Memorandum of Law asserts:

> Petitioner fails to argue or demonstrate how [Wayne] Harris's testimony would have been sufficient to influence the jury. There is no indication from the record or in Petitioner's argument that Wayne Harris could have offered any exculpatory or even relevant testimony. Likewise, given the anecdotal evidence in the record, it could easily be presumed that Wayne Harris was an equally damaging figure as the other players in this case. Trial counsel cannot be held to be incompetent for not calling a witness who was asleep during the time of the assault and who did not have any other relevant testimony to offer that went to guilt or innocence.

(# 7 at 10).

Petitioner's "Reply" further addresses this claim as follows:

> Absent an interview, Mr. Callaghan did not know if Mr. Harris was the individual who alleged that petitioner had been seen kissing M.H. on the neck and fingering her while staying at his residence. Any reasonable attorney would establish prior to trial if Wayne Harris was the individual who made the allegation on October 3, 2000.

(# 11 at 16-17).

Petitioner has not offered any evidence or argument to support a finding that calling Wayne Harris as a defense witness at trial would have altered the jury's verdict. Accordingly, the

20

undersigned proposes that the presiding District Judge **FIND** that Petitioner has not shown that Mr. Callaghan's failure to call Mr. Harris as a witness was ineffective.

The undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly-established federal law, and that Respondent is entitled to judgment as a matter of law on this claim.

### 3.   The victim.

Petitioner's federal petition further asserts that Mr. Callaghan did not interview the alleged victim, M.H., prior to trial.  (# 1 at 3).  Petitioner does not offer any additional evidence or argument about what potentially useful information Mr. Callaghan could have garnered from such an interview, if the alleged victim would have even agreed to be interviewed.

Respondent's Memorandum of Law contends that the alleged victim testified at trial, and was available for cross-examination. She also gave a videotaped statement to authorities which Mr. Callaghan reviewed prior to trial.  Respondent adds, "Petitioner does not argue what any pre-trial interview of the victim would have revealed that would have influenced the verdict at trial." (# 7 at 10).

21

Petitioner's "Reply" states in pertinent part:

A pre-trial interview of M.H. is a necessary part of any trial preparation.  Such an interview would have allowed Mr. Callaghan to ask specific relevant questions not answered in discovery, to require M.H. to again tell her story out of the presence of the jury and permit counsel to identify evidence of "steered" or inconsistent testimony. Any reasonable defense counsel knows that the more opportunities a witness is given to formally state her version of events, the more opportunities there are for counsel to identify inconsistencies and prepare to impeach the witness.  The State Habeas Court and Mr. Callaghan apparently considered the victim's videotaped statement tantamount to an interview . . . . Petitioner respectfully disagrees.

    In [sic; If] Mr. Callaghan interviewed H.W. [sic; M.H.] before trial, he would have had an opportunity to question M.H. about her telephone conversation with petitioner following her initial accusation.  This topic is not addressed in the videotaped statement.  Petitioner testified that M.H. asked him to lie to investigators and say he had abused her in order to protect her from being removed from her parent's custody.

                        * * *

Petitioner submits that it is unreasonable for Mr. Callaghan to fail to introduce evidence that supported petitioner's testimony if it is available.

(# 11 at 14-16).

    First, Petitioner's argument pre-supposes that the victim, M.H., would have agreed to be interviewed by Mr. Callaghan.  She was not required to grant him an interview.  Second, Petitioner has not offered any specific evidence that an interview of M.H. would have uncovered that would have altered the jury's verdict. Petitioner's argument is rife with speculation.

22

The state habeas court made the following findings concerning this claim for relief:

> Another witness identified in Petitioner's brief is the victim.  The Petitioner claims that Mr. Callaghan failed to interview the victim prior to trial, which "would have been a necessary part of trial preparation . . . ." Petitioner's Brief page 6.  The Petitioner states that another advantage of interviewing the witness before trial is that counsel will have a sense of how the witness will react to the question on the stand.  This would have been important in asking whether the victim asked the Petitioner to lie for her so that she would not be taken from her mother, as the Petitioner claims.  In this case, Mr. Callaghan viewed the videotaped statement of the victim.  He took notes and reported back to the Petitioner.

> Q.   Did you independently examine or interview this child prior to trial?

> A.   No.

> Q.   Did you ask the Court for permission to interview this child prior to trial so you could draw your own conclusions?

> A.   I drew my own conclusions from the video statement, and I concluded that she was going to say that at trial; and it was going to hurt him, and that she was qualified and competent to say that.

> Q.   Don't you agree that you could have used an interview prior to trial to flush out some things that you weren't sure about what she might testify to that would have been of help to you?

> A.   I don't know what the interview might have showed. I didn't interview her prior to trial.

> Q.   You did ask her at trial did she have a telephone conversation with Mr. Abido after she gave the statement incriminating him and accusing him of a crime and before he was arrested.  Is that correct?

> A.   I believe so.

23

> Q. But you did not go into any detail concerning what took place during that telephone conversation.  Mr. Abido testified that she asked him to lie for her?
>
> A. Did I ask her that?
>
> Q. Yes.
>
> A. I don't recall.
>
> Q. The record does not indicate that you asked her at trial.  Don't you think that would have been something that you should have known the answer to?
>
> A. Mr. Abido testified that she lied.  I was - I cross-examined to the extent that I thought I should.  It's hard to accuse an eleven-year-old of lying in front of a jury and not appear to be mean to the witness.  I prepared for the cross-examination, and I pushed it just as hard as I thought it should go.

(# 6, Ex. 6 at 8-9).

The undersigned proposes that the presiding District Judge **FIND** that Petitioner has not shown that Mr. Callaghan's failure to interview the victim before trial was ineffective.  The undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly-established federal law, and that Respondent is entitled to judgment as a matter of law on this claim.

### 4.  Melanie (Cindy) Deal and Edward (E.T.) Barr.

Petitioner's federal petition further asserts that Mr. Callaghan provided ineffective assistance of counsel because he failed to interview, or call as witnesses at trial, Petitioner's

24

ex-wife, Melanie (Cindy) Deal, or the victim's cousin, Edward (E.T.) Barr.  Petitioner contends that both of these people could have testified that they witnessed the victim, M.H., carve Petitioner's initials into her ankle in an act of self-mutilation. Petitioner further contends that this evidence would have demonstrated the victim's obsession with Petitioner and "was substantial corroboration of petitioner's trial testimony." (# 1 at 4).  Petitioner claims that the failure to present this evidence denied him a chance of acquittal.  (Id.)

Respondent's Memorandum of Law addressed this claim as follows:

> Trial counsel testified at the habeas hearing conducted on September 15, 2006, that he was of the professional opinion that any such testimony about the eleven-year-old's self-mutilation by way of carving Petitioner's initials into her own flesh would be detrimental to the defense.  The assertions of trial counsel indicate a strategic decision in its purest sense. As previously noted, the habeas court held that the decision by trial counsel not to include this disturbing evidence was a reasonable trial strategy.  The habeas court further determined that no prejudice would have resulted even had trial counsel's actions been unreasonable in this regard.  (Resp't Ex. 6 at 11-12). The habeas court specifically cited to Petitioner's testimony at trial that he was in love with the mentally challenged eleven year old victim, as evidence too damaging to overcome and "crippling" to the defense. (Id.)  The trial court determined that in light of Petitioner's testimony Petitioner could not "show that it was likely that a jury would have reached a different result [had the challenged evidence been brought in at trial.]" (Resp't Ex. 6 at 11.)
>
> As with prior arguments in support of this claim, Petitioner fails to either argue or demonstrate how the actions of trial counsel were unreasonable or

prejudicial.  Petitioner also fails to offer any argument
as to why the holdings of the habeas court are contrary
to or an unreasonable application of controlling federal
precedent.    Rather  Petitioner  only  cites  to  the
speculative testimony and presumptively asserts it was
ineffective for trial counsel not to introduce it.

(# 7 at 11).

Petitioner's "Reply" contends that "[d]efense counsel did not

interview Melanie Deal or Edward Barr so he had not obtained the

facts on which the decision not to call the witnesses might be

based.  His testimony at the Habeas hearing constitutes little more

than an ad-hoc rationalization to excuse his failure to conduct a

reasonable investigation." (# 11 at 10).  Petitioner adds:

> Melanie Deal testified at the 2006 habeas hearing.
> She swore that she had seen the scars resulting from
> M.H.'s cutting.  This information was a crucial
> substantiation of petitioner's trial testimony.  The
> failure [to] present this evidence to the jury denied
> petitioner the necessary corroboration of his trial
> testimony and any chance of acquittal.  The prejudice
> prong of the <u>Strickland</u> test is also satisfied. Melanie
> Deal would also testify that she had heard Barbara Harris
> and M.H. offering to perform oral sex upon petitioner,
> talking about doing nasty things to him for months at a
> time and that petitioner had always said no.
>
> Petitioner also told his attorney that Edward Barr
> has seen the scars from M.H.'s cutting her ankle.  Mr.
> Callaghan did not interview Mr. Barr or subpoena him as
> a witness.

(<u>Id.</u> at 11).

The state habeas court made the following findings concerning

this claim:

> One of the issues the petitioner has with Mr. Callaghan's
> representation of him is the fact that Mr. Callaghan did
> not bring up the fact that the victim allegedly carved

26

the Petitioner's name or initials into her ankle. The Petitioner believes that this bolsters his position that she was infatuated with him, that someone else instigated the conduct, and that she came onto him. The Petitioner claims that both Melanie Deal and Edward Barr could testify to the fact that the victim did in fact carve the Petitioner's initials into her ankle. The Petitioner claims that Ms. Deal saw the alleged scarring and that Mr. Barr actually helped the victim carve the initials into her ankle. Mr. Callaghan testified at the Habeas Corpus Evidentiary Hearing that he did not think that introducing such evidence would help his case.

Q.   Did Mr. Abido tell you that [M.H.] had cut his initials into her ankle?

A.   Yeah, and I didn't want that in front of the jury either because that shows to me an unhealthy and immoral attraction from an eleven-year-old to a thirty-seven-year-old. But there again, he testified that "she carved my initials in her leg," or whatever.

Q.   Don't you think that an unhealthy attraction would have supported his claim that she was obsessed with him, and that she was fantasizing of what their relationship was?

A.   I don't think she fantasizing about him or being obsessed with him is a defense to molesting her. "She just came on to me. She was obsessed with me." I don't think that's a defense, and I didn't want the jury to hear any of that.

Q.   But his defense at that time was he had not done that?

A.   Well, yeah.

Q.   Did you make any effort to contact any of the witnesses who Mr. Abido said would substantiate that the child had cut these initials into her leg?

A.   No. I stayed away - In my judgment, I stayed away from that initials thing because it would further show the jury that she's obsessed with him and vice versa; and it completely - I mean substantiated the bond, the irrational, immoral bond that they had

between each other.

Q.    Do you think that - When did he first tell you about these initials?

A.    I don't know.

Q.    Was it early on in your contact with him?

A.    Probably, probably.

Q.    Did you at any time consider requesting a court order to have [M.H.] examined to determine whether she had any physical evidence of this scarring from these cuts?

A.    I wanted to stay away from that issue.  I thought it hurt his case.  And the question I asked him was: Even if she did carve your initials in her leg, how does that show that you did or did not molest her?  He couldn't really explain.  It was part of his whole "she kept coming onto me; I'm the victim" idea.

Id. at pp. 29-31.  (# 6, Ex. 6 at 6-7).

Petitioner has not demonstrated that the testimony of Melanie Deal or Edward Barr would have altered the jury's verdict.  Thus, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not shown that Mr. Callaghan's failure to interview Melanie Deal or Edward Barr, or to call them as witnesses at trial, was ineffective.  The undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly-established federal law, and that Respondent is entitled to judgment as a matter of law on this claim.

### 5.   Matilda Barr.

In passing, in his federal petition, Petitioner asserts that Mr. Callaghan was ineffective because he did not interview, or call as a witness at trial, the alleged victim's mother, Matilda Barr. Petitioner does not offer any potential testimony that Ms. Barr could have given that he believes would have bolstered his defense or altered the jury's verdict.   Petitioner's "Reply" offers this additional argument:

> Petitioner testified at trial that he gave an inculpatory statement, relief [sic; relied] upon by the habeas court as conclusive evidence of petitioner's guilt, to Trooper Reed, the investigating officer, after M.H. telephoned him to say she had wrongfully accused him and that she had asked him to substantiate here [sic; her] story so she could avoid being removed from her parents' home.   Petitioner told Mr. Callaghan that the child's mother, Matilda Barr, had listened in on this conversation.   Defense counsel never asked Ms. Barr if she could in fact substantiate this aspect of petitioner's testimony.   Mr. Callaghan did not subpoena Ms. Barr and she did not testify at trial. [Footnote omitted].   She would have been a bombshell witness if she had been questioned in a timely manner.

(# 11 at 18).

Petitioner had to overcome his very damaging confession to Trooper Reed that he had engaged in sexual conduct with M.H. that was sufficient to satisfy the essential elements of the crime of first degree sexual assault.   Petitioner also gave very damaging testimony about his feelings for M.H.   Petitioner had an obligation to tell the truth.   By giving inconsistent statements, Petitioner called his own credibility into question.   Furthermore, it is not

29

reasonable to believe that a suspect would give an inculpatory statement so far against his own interest because the victim asked him to do so.  Moreover, even if Matilda Barr had testified, as the victim's mother, her testimony could have been more detrimental than helpful to Petitioner's defense.

Based upon all of these facts, it was not unreasonable for Mr. Callaghan to not pursue using Ms. Barr as a defense witness. Furthermore, Petitioner has not demonstrated that Ms. Barr's testimony would have altered the jury's verdict.   Thus, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not shown that Mr. Callaghan's failure to interview Matilda Barr, or to call her as a witness at trial, was ineffective.  The undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly-established federal law, and that Respondent is entitled to judgment as a matter of law on this claim.

### 6.   Shelly Little.

For the first time in his "Reply" to Respondent's Motion for Summary Judgment, Petitioner also asserts that Mr. Callaghan was ineffective because he failed to call Shelly Little, a Child Protective Services investigator for the DHHR, who apparently completed the intake sheet for the October 3, 2003 complaint about

the sexual assault of the victim.   (# 11 at 11-12).   Petitioner admits that he did not raise this claim in his section 2254 petition and has sought leave to amend his petition to add this claim.   By separate Order, the undersigned has granted Petitioner leave to amend his section 2254 petition to include this claim of ineffective assistance of counsel.   Petitioner raised this issue in his state habeas proceedings[2];   however, the undersigned does not know whether any evidence concerning this specific claim was presented at the omnibus hearing in December of 2006.[3]

Petitioner's "Reply" states in pertinent part:

> Trial counsel failed to interview Shelly Little, a Child Protective Service investigator for the Department of Health and Human Resources (DHHR).  Her intake sheet dated October 3, 2003, included an allegation that petitioner had been seen kissing M.H. on the neck and fingering her while at Wayne and Barbara Harris' residence.  The identity of the reporter does not appear in the police report.  Seventeen days later, two children of Barbara and Wayne Harris were removed from their care and taking [sic; taken] into emergency custody by Cheryl Pittsenbarger and Ms. Little.   An [sic; Any] reasonable attorney would assume that Ms. Little spoke to M.H.

---

[2]   This federal court was not initially provided with a copy of the Petition for a Writ of Habeas Corpus that was filed by attorney Harley E. Stollings, who was appointed to represent Petitioner in his Nicholas County habeas corpus proceeding.   However, the undersigned's staff requested a copy of that Petition.   On November 6, 2008, Respondent's counsel faxed a copy of the Nicholas County petition to the undersigned, and it has been made a part of this court's record as "Court's Exhibit A."

[3]   According to Respondent's Memorandum of Law, the omnibus hearing was not fully transcribed, so there is no complete transcript in the court record.   Rather, the habeas court quoted from excerpts of the hearing record, and only one witness's testimony (that of Melanie Smith) was transcribed and included in the record before this court.

> immediately after being told that petitioner had been
> seen kissing and fingering M.H. at the Harris domicile.
> Ms. Little would not have waited until 14 days latter
> [sic; later].
>
> Any reasonable attorney would have asked Ms. Little
> if she had interviewed M.H. [and] asked what M.H told
> her. Any reasonable defense lawyer would have wanted to
> know if Barbara or Wayne Harris were the individuals who
> alleged they had seen petitioner fingering M.H. at their
> home. No steered evidence defense is plausible or have
> a palpable degree of success without a detailed
> examination of any notes and records from the first
> interview of M.H. Mr. Callaghan did not have to issue a
> blanket subpoena for the DHHR's file to access this
> information. Counsel should have interviewed Ms. Little,
> and, if she was not cooperative, the trial court would
> have order[ed] Ms. Little to disclose her notes.

(# 11 at 11-12).

In support of his claim that Mr. Callaghan's failure to
interview Ms. Little was ineffective, Petitioner cites to a West
Virginia case in which the SCAWV held that a defense attorney's
failure to interview a DHHR case worker, whose report contradicted
the victim's testimony concerning the time of day that an alleged
sexual assault occurred, fell below an objective standard of
reasonableness. See Edgell v. Painter, 522 S.E.2d 636 (W. Va.
1999). (Id. at 12 n.27). However, even if this court were to find
that Mr. Callaghan's failure to interview Ms. Little, or any of the
other potential defense witnesses proffered by Petitioner in his
federal petition, fell below an objective standard of
reasonableness, Petitioner must still demonstrate that his defense
was unduly prejudiced by that failure. Petitioner further argues:

Prejudice arose from counsel's failure to identify the first interviewer and the details of that first interview. During the videotaped interview with Cheryl Pittsenbarger, which the jury viewed, M.H. used such terms as "screw" to refer to sexual intercourse and "privates" to refer to her genitalia. The interview with Ms. Pittsenbarger was not the first interview with M.H. concerning the alleged sexual misconduct. When M.H. testified at trial, she replaced the colloquial language with such terms as "vagina" and "penis." These changes in the choice of language indicated the M.H. had been steered or coached by suggestive input from caseworkers or investigators. Mr. Callaghan's failure to secure and place in the trial record the first contact with M.H. and her initial, unrefined description of petitioner's conduct was clearly deficient performance by an officer of the court, and prejudicial to his client's defense. There is a reasonable probability that the outcome of petitioner's trial would have been different if the omission had been avoided.

(Id. at 13).

The undersigned proposes that the presiding District Judge **FIND** that this claim lacks merit because Petitioner has not presented sufficient evidence to demonstrate undue prejudice from his counsel's conduct. Petitioner has not presented any evidence to demonstrate how any information garnered from an interview of Ms. Little, or by calling her as a defense witness, would have altered the outcome of the jury's verdict. Petitioner's speculation that M.H.'s alteration of the terms used to describe the sexual contact she alleges against Petitioner meant that her testimony was coached or steered is insufficient to demonstrate the requisite prejudice.

Therefore, the undersigned proposes that the presiding District Judge **FIND** that the state habeas courts' denial of habeas

corpus relief on this claim of ineffective assistance of counsel was neither contrary to, nor an unreasonable application of, clearly-established federal law, and that Respondent is entitled to judgment as a matter of law on this claim.

**B.    Ground Two - Denial of defense motion to pre-trial discovery of victim's DHHR records.**

In a related claim contained in Ground Two of his federal habeas petition, Petitioner contends that the trial court erred by denying Mr. Callaghan's motion to produce the DHHR's records concerning the victim, M.H. (# 1 at 4).  The federal petition states:

> Mr. Callaghan did not ascertain who conducted the initial DHHR interview with the petitioner [sic; victim?] Petitioner has alleged that someone other than Cheryl Pittsenbarger may have taken the initial statement of the victim.  Petitioner's defense counsel moved the Court to be granted access to the entire DHHR file, which was vigorously opposed by the DHHR.  Ultimately, the Court ruled against the Petitioner and denied him access to the requested material, with the exception of the intake sheet.  The motion to [sic; for] discovery was initially denied as overbroad.  Mr. Callaghan did not file a more specific request.  A specific request to identify the first interviewer and review their notes and any recordings from that interview would have been granted and would have accessed crucial information.  Edgell v. Painter, 206 WV [sic; W. Va.] 168 (1999).

(Id.)

Respondent's Memorandum of Law asserts that Petitioner's claim alleges only trial court error and does not allege the violation of a specific federal constitutional right (citing Barbe v. McBride, 521 F.3d 443 (4th Cir. 2008).  (# 7 at 12).  As noted by

34

Respondent, in Barbe, the Fourth Circuit held:

> Importantly, in considering federal habeas corpus issues involving state evidentiary rulings, "we do not sit to review the admissibility of evidence under state law unless erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding." Burket v. Angelone, 208 F.3d 172, 186 (4th Cir. 2000). "It is only in circumstances impugning fundamental fairness or infringing specific constitutional protections that a federal question is presented." Spencer v. Murray, 5 F.3d 758, 762 (4th Cir. 1993)(internal quotation marks omitted); see also Estelle v. McGuire, 502 U.S. 62, 68, 112 S. Ct. 475, 115 L. Ed.2d 385 (1991) (explaining that "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States").

521 F.3d at 452-453. (# 7 at 12). Respondent's Memorandum of Law

further states:

> In order for Petitioner to prevail on a challenge to an evidentiary ruling by the trial court, Petitioner would be required to demonstrate that the trial court's ruling rendered the trial fundamentally unfair. Id.

> * * *

> Petitioner does not argue how the denial of trial counsel's motion to produce the victim's DHHR records rendered the trial fundamentally unfair. The victim testified at trial and was available for cross-examination. The record contains enough evidence to suggest that the victim was not only mentally challenged but profoundly disturbed as were other adult members of her family. However, this evidence was available outside the DHHR record and easily gathered from the evidence at trial. Even had the files contained inconsistencies with the trial testimony or other exculpatory statements it is unlikely that trial counsel would have been able to attack the victim's credibility in light of the tragic circumstances surrounding this crime. Trial counsel stated in his habeas hearing testimony that his strategy was turned away from attacking the credibility of the victim and toward attacking the sufficiency of the State's case as well as the credibility of law

enforcement officers.  (Resp't Ex. 6 at 10.)  Even had
the victim recanted or made contradictory statements in
the DHHR interviews, it would not have assisted trial
counsel with the defense if the trial strategy was to
focus on the State's case and the credibility of law
enforcement officials.

    Petitioner has failed to demonstrate that the ruling
of the trial court rendered the trial fundamentally
unfair.  This claim fails.

(<u>Id.</u> at 13-14).

    Petitioner's "Reply" contends that the effectiveness of Mr.

Callaghan's cross-examination was "limited by the State's failure

to provide the case records of the Department of Health Services

[sic; DHHR] detailing their intervention in M.H.'s life, counsel's

failure to interview M.H., counsel's failure to secure an

independent physical and psychological examination of M.H. and his

own subjective limitation on his cross-examination of M.H. . . ."

(# 11 at 19).  Petitioner adds, "[w]hether the failure to disclose

the DHHR records which were readily available to the prosecuting

attorney, is attributed to defense counsel or the Court,

petitioner's Sixth Amendment right of confrontation was impaired.

(<u>Id.</u> at 21).

    To the extent that Petitioner is claiming an alleged violation

of his due process rights because of the trial court's ruling

denying him access to the entire DHHR file on the alleged victim

and her family, Petitioner has not sufficiently demonstrated that

the trial court's ruling prohibiting the production of the entire

DHHR file had a "substantial and injurious effect or influence in determining the jury's verdict." See Brecht, 507 U.S. at 637. Thus, any such error was harmless. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the state courts' rulings denying habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly-established federal law, and that Respondent is entitled to judgment as a matter of law on this claim.

**C. Other claims raised by Petitioner.**

In his "Reply" brief, Petitioner, for the first time in any of his habeas corpus proceedings, claims that his consecutive sentences for violating W. Va. Code § 61-8B-7 violate the Fifth Amendment's prohibition against double jeopardy (# 11 at 2), and also appears to be asserting that the State of West Virginia wilfully suppressed material information concerning Barbara Harris's criminal history. (Id. at 9). Petitioner has not exhausted his state court remedies concerning either of these claims. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Petitioner is barred from pursuing habeas corpus relief on those claims in this federal court.

**RECOMMENDATION**

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** Respondent's Motion for Summary Judgment (# 6).

37

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, Chief United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have ten days (filing of objections) and then three days (service/mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the district court and a waiver of appellate review by the circuit court of appeals.  <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>Wright v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on the opposing party, Chief Judge Goodwin, and this Magistrate Judge.

38

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to Petitioner and counsel of record.

November 14, 2008
Date

Mary E. Stanley
United States Magistrate Judge

39